IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION


UNITED STATES OF AMERICA,                    :

        Plaintiff,                            :

                                   Case No. 3:04cr086(1-7)

        vs.                                   :

                          JUDGE WALTER HERBERT RICE

JORGE PAREDES-LIMA, et al.,                   :

        Defendants.                          :

---

DECISION AND ENTRY OVERRULING MOTION TO SUPPRESS
EVIDENCE OF DEFENDANT JORGE LEANDRO PAREDES-LIMA
(DOC. #35); DECISION AND ENTRY OVERRULING MOTION TO
SUPPRESS EVIDENCE OF DEFENDANT FRANCISCO CAMACHO
(DOC. #37); DECISION AND ENTRY OVERRULING MOTION TO
SUPPRESS EVIDENCE OF DEFENDANT RUDOLPH RHABURN
(DOC. #38); DECISION AND ENTRY OVERRULING MOTION TO
SUPPRESS EVIDENCE OF DEFENDANT JANETTE REYNAGA
(DOC. #39); DECISION AND ENTRY OVERRULING IN PART AND
OVERRULING, AS MOOT, IN PART MOTION TO SUPPRESS
EVIDENCE OF DEFENDANT ALARIC SIMON (DOC. #40); DECISION
AND ENTRY OVERRULING MOTION TO SUPPRESS EVIDENCE OF
DEFENDANT JOSE SERVIN (DOC. #41); DECISION AND ENTRY
OVERRULING MOTION TO SUPPRESS EVIDENCE OF DEFENDANT
CIRILO TORRES-RAMOS (DOC. #44)

---

Defendants Jorge Leandro Paredes-Lima ("Paredes-Lima"), Rudolph Rhaburn,

aka Antwan King ("Rhaburn"), Alaric Simon ("Simon"), Jose Servin ("Servin"), Janette

Reynaga ("Reynaga"), Francisco Camacho ("Camacho") and Cirilo Torres-Ramos

("Torres-Ramos") are charged in the Indictment (Doc. #16) with one count of conspiring

to distribute and to possess with intent to distribute in excess of five kilograms of

cocaine, in violation of 21 U.S.C. § 846.[1]  Servin, Reynaga, Camacho and Torres-Ramos are also charged with one count of traveling in interstate commerce for the purpose promoting an unlawful activity, in violation of 18 U.S.C. § 1952.

Much of the evidence upon which those charges are based was obtained by the Government as a result of the May 26, 2004, stop and subsequent search of a blue GMC van with Washington state license plates.  Nine kilograms of cocaine were discovered during that search.[2]  As a consequence, each of the Defendants has filed a motion requesting that the Court suppress evidence.  See Motion to Suppress Evidence of Paredes-Lima (Doc. #35); Motion to Suppress Evidence of Camacho (Doc. #38); Motion to Suppress Evidence of Rhaburn (Doc. #38); Motion to Suppress Evidence of Reynaga (Doc. #39); Motion to Suppress Evidence of Simon (Doc. #40); Motion to Suppress Evidence of Servin (Doc. #41); and Motion to Suppress Evidence of Torres-Ramos (Doc. #44).  This Court conducted an oral and evidentiary hearing on these motions which extended over seven days, beginning on August 6, 2004, and concluding on March 2, 2005.  The parties have filed post-hearing memoranda.  See Docs. ##85, 87-92, 94-96 and 101.

In their post-hearing memoranda, all of the Defendants except Paredes-Lima have argued that the search of the blue GMC van violated the Fourth Amendment and that, therefore, the nine kilograms of cocaine seized from it must be suppressed.[3]

_____

[1]In papers he has filed, Torres-Ramos has spelled his name "Tores-Ramos."  The Court has used the former spelling to be consistent with the spelling utilized in the Indictment.

[2]In addition, another vehicle in which Rhaburn and Simon had been traveling on that date was searched, with evidence being seized.  Moreover, evidence was seized from the person of Paredes-Lima.

[3]The Court focuses upon the Defendants' arguments in their post-hearing memoranda, rather than upon the arguments in their motions, because some of the propositions advanced in their motions may have been rendered moot or abandoned.  The Court overrules every branch of all motions to suppress, which

Rhaburn and Simon also contend that the Court must suppress the evidence which was seized from the automobile in which they had been traveling on May 26, 2004.[4] Paredes-Lima has requested that the Court suppress the evidence which was seized from him when he was arrested on May 26, 2004.  As a means of analysis, the Court will initially address the parties' arguments pertaining to stop and search of the blue GMC van, following which the Court will turn to the requests of Rhaburn and Simon to suppress the evidence which was seized from the automobile in which they had been traveling and the motion filed by Paredes-Lima, discussing those latter two matters together.

I.  Evidence Seized from the Blue GMC Van on May 26, 2004

        At approximately 11:00 a.m., on May 26, 2004, Reynaga was driving a blue GMC van south on Interstate 75, in Shelby County, Ohio.  Camacho, Servin and Torres-Ramos were passengers in that vehicle.[5]  At that time, Trooper Chris Coverstone ("Coverstone") of the Ohio State Highway Patrol was parked in the median of that highway in his marked cruiser, checking the speed of the southbound traffic with the laser unit in his cruiser.  He observed the blue GMC van driven by Reynaga being driven at a rate which appeared to be in excess of the posted speed limit of 65 miles per hour.  Accordingly, Coverstone activated the laser unit and obtained a reading which

_____

were not raised and argued in the appropriate Defendant's post-hearing memorandum.

[4]In his post-hearing memorandum (Doc. #90), Simon also argues that the Court must suppress the evidence that was seized from his room at the Extended Stay Hotel.  Given that the Government has indicated that it will not seek to introduce such evidence at trial (see Transcript of August 6, 2004, Evidentiary Hearing (Doc. #58) at 6), the Court overrules this branch of Simon's Motion to Suppress Evidence (Doc. #40), as moot.

[5]Another individual was traveling in that vehicle; she has not been charged in the Indictment in this case.

indicated that the van was traveling 72 miles per hour. The Trooper then pulled from the median, caught up with that van and activated the overhead lights on his cruiser. The van pulled over with Coverstone's cruiser behind it, about one mile south of where the Trooper had first observed it.

Coverstone got out of his cruiser and, at the same time, asked the driver of the blue GMC van to get out of that vehicle. He met Reynaga between the two vehicles. She was carrying the registration for that van. In response to the Trooper's request, Reynaga went back to the van in order to retrieve her driver's license. While he was waiting for Reynaga to return with her driver's license, the Trooper noted that the van had been registered, eight days earlier, to Paula Rojas Demechor ("Demechor") of Vancouver, Washington.[6] Reynaga returned and gave Servin's California ID to Coverstone. The Trooper then asked that she produce her driver's license. Reynaga gave her license to Coverstone, who noted that she resided in Compton, California. Coverstone then asked Reynaga a few questions about the owner of the van, her companions and her travel plans. After Coverstone and Reynaga had briefly conversed at the side of the road, the two went to the Trooper's cruiser. When they got inside that vehicle, Coverstone contacted his dispatcher to request that she contact Sergeant Jeff Gilman ("Gilman") of the Shelby County Sheriff's Department and ask him to come to the location of the stop with his drug detection dog, Emir. Coverstone then returned to the GMC van and briefly questioned Servin, whose California ID had been given to him by Reynaga,[7] about the owner of the van, his trip and his companions. Servin indicated, inter alia, that he resided in Carson, California.

During their conversations with Coverstone, Reynaga and Servin had given him wildly divergent explanations of how two residents of California had come to be on

_____

[6]Demechor was not a passenger in the van when it was stopped on May 26, 2004.

[7]Reynaga had also identified Servin as her boyfriend.

Interstate 75 in Shelby County, Ohio, in a GMC van, which had been registered eight days earlier, owned by a woman who lived in Vancouver, Washington. According to Reynaga, her Aunt Paula owned the van. She did not know her aunt's last name, because she (Aunt Paula) had recently been married. Reynaga explained that she and her four companions had flown from Los Angeles to Vancouver, Washington, where they had stayed for three days with her Aunt Paula and picked up the van, in order to drive to the Dayton area to visit a friend. She was unable to give a precise description of where that friend lived. Reynaga indicated that they would only stay a day or so, since she had to be at work at Disneyland the following Saturday.[8] Servin, in contrast, indicated that the van was owned by his Aunt Paula, whose last name he did not know.[9] His Aunt Paula had driven her van from Vancouver to the Los Angeles area in order to give it to Servin, so that he and his companions could drive it across the country to visit his Aunt Ernestino, whom, he indicated, he had previously visited. They would stay a few days and then return to California. Servin's Aunt Paula would then return the van to Vancouver.

After conversing with Servin, Coverstone returned to his cruiser and again asked Reynaga about the owner of the van and her travel plans. She confirmed that the van was owned by her Aunt Paula and that she and her companions had traveled to Vancouver to get that vehicle.[10] She also told the Trooper that neither she nor Servin had previously visited the friend whom they had been traveling to see.

_____

[8]May 26, 2004, the day upon which the Coverstone stopped the GMC van, was a Wednesday.

[9]Servin confirmed one statement that Reynaga had made to Coverstone, by indicating that she was his girlfriend.

[10]Coverstone also asked Reynaga about how she had traveled from Los Angeles to Vancouver. She said that she thought that she had flown on American Airlines, but she could not remember on which day that flight had occurred.

Coverstone then contacted his dispatcher to ask for information on Reynaga, Servin and the vehicle in which they were traveling.  He also contacted the Drug Enforcement Agency ("DEA") center in El Paso, to inquire about the occupants of the van and Demechor, the owner of that vehicle.[11]  Coverstone learned from the Center that authorities had been carrying on an investigation involving Demechor and her residence in Vancouver, including conducting wiretapping at that location.

Approximately 35 minutes after Coverstone had stopped the blue GMC van, Gilman and his dog arrived at the scene of the stop.  As Gilman walked his canine around the van, the dog alerted.  At that point the officers on the scene removed those who remained in the van from that vehicle and placed them in police vehicles.  They then searched the van, discovering nine kilograms of cocaine.

In its opening post-hearing memoranda, the Government argues that none of the Defendants had a legitimate or reasonable expectation of privacy in the blue GMC van and, thus, standing to challenge its search.[12]  See Doc. #91 at 10-12.  For reasons which follow, the Court agrees that none of the Defendants had such an expectation of privacy in that vehicle.

It is axiomatic that a defendant has the burden of showing a legitimate or reasonable expectation of privacy in the area searched.  United States v. Salvucci, 448 U.S. 83, 86 (1980); United States v. Berryhill, 352 F.3d 315, 316-17 (6th Cir. 2003), cert. denied, 124 S.Ct. 2924 (2004).  Herein, none of the of the Defendants has argued that he or she had a legitimate expectation of privacy in the blue GMC van.

---

[11]After Coverstone had requested that Gilman and his dog come to the scene of the stop, other Troopers from the Ohio State Highway Patrol had arrived.  One of those law enforcement officials had obtained the identity of the three occupants of the van in addition to Reynaga and Servin, information which Coverstone had given to the El Paso center.

[12]It bears emphasis that Paredes-Lima has not requested that the Court suppress the evidence which was seized from the GMC van.

Indeed, such an argument would have been unavailing. For instance, no Defendant presented evidence that he or she had an ownership interest in that vehicle. Moreover, this Court cannot find that any of the six Defendants, who seek the suppression of the cocaine that was seized from the van, had been given permission to drive it by Demechor, its owner. Although Reynaga and Servin each told Coverstone that the vehicle belonged to his or her Aunt Paula, who had given it to him or her to drive to Ohio, such statements do not cause this Court to find that Demechor entrusted the van to either of them. Quite simply, those two Defendants gave Coverstone such diametrically opposite explanations about how they, residents of the Los Angeles area, came to be in Ohio in a vehicle owned by a woman who lived in Vancouver, Washington, that the Court cannot credit those explanations.

Therefore, the Court concludes that Servin, along with Camacho and Torres-Ramos, were merely passengers in the GMC van. In Rakas v. Illinois, 439 U.S. 128 (1978), the defendants, who were passengers in an automobile driven by another, argued that they had a reasonable expectation of privacy in that vehicle and, thus, standing to assert that its search violated their Fourth Amendment rights by the mere fact that they were legitimately in the vehicle. The Supreme Court disagreed, noting that the defendants "asserted neither a proprietary nor a possessory interest in the property seized." Id. at 148. In accordance with Rakas, this Court must conclude that Servin, Camacho and Torres-Ramos did not have a legitimate or reasonable expectation of privacy in the van, since none had a proprietary or possessory interest in that vehicle.[13] Not only did Rhaburn and Simon lack such an interest in the van, they

---

[13]In United States v. Dunson, 940 F.2d 989 (6th Cir. 1991), cert. denied, 503 U.S. 941 (1992), the Sixth Circuit held that a passenger in a borrowed vehicle who, with the driver, had participated in borrowing the car from its owner, had a reasonable or legitimate expectation of privacy in the vehicle. Herein, this Court cannot find that any occupant of the GMC van participated in borrowing it from its owner.

were not even in it when it was stopped.  Therefore, the Court concludes that neither of them had a legitimate or reasonable expectation of privacy in that vehicle either.

Although the Government argues that Reynaga was without a legitimate expectation of privacy in the van, it analyzes the question a bit differently, as will the Court.  Reynaga failed to demonstrate that she had either an proprietary or a possessory interest in the GMC van.  Although she was its driver, the Government argues this fact does not establish that she had such a reasonable expectation of privacy.  In support of that argument, the Government relies upon United States v. Smith, 263 F.3d 571 (6th Cir. 2001).  Therein, the Sixth Circuit concluded that the driver of a rental car, who had neither rented the car nor was listed as an authorized driver on the rental agreement, had a legitimate expectation of privacy and, thus, standing to challenge its search.  The Smith court, after discussing a number of cases in which courts have held that such a person is without standing, wrote:

> We acknowledge that as a general rule, an unauthorized driver of a rental vehicle does not have a legitimate expectation of privacy in the vehicle, and therefore does not have standing to contest the legality of a search of the vehicle.  However, we refuse to adopt a bright line test, as the government seems to advocate, based solely on whether the driver of a rental vehicle is listed on the rental agreement as an authorized driver.  Such a rigid test is inappropriate, given that we must determine whether Smith had a legitimate expectation of privacy which was reasonable in light of all the surrounding circumstances.

Id. at 586.  The Sixth Circuit distinguished the cases it had discussed earlier and concluded that Smith had standing because of the following circumstances.  He had personally contacted the rental car company and reserved the vehicle in his name, using his own credit card, which was billed for the rental.  His wife, Tracy Smith, had picked up the vehicle and furnished the agent with the reservation number which had been given to Smith.  Tracy Smith presented her driver's license and signed the rental agreement.  Smith was driving the vehicle at the time of the stop, and held a valid driver's license.  Tracy Smith, who was both the lawful renter of the vehicle and an

individual with whom Smith had an intimate relationship, had given him permission to drive the vehicle. The most important points to the Sixth Circuit were Smith's close personal relationship with the authorized driver of the rental car and his business relationship with the rental company. See id. at 586-87. Reynaga failed to demonstrate that she had an analogous relationship with the owner of the GMC van. On the contrary, since Reynaga failed to demonstrate that she had a relationship with Demechor or that she had been authorized by Demechor to drive the van,[14] Reynaga is closely analogous to the typical unauthorized driver of a rental car, whom the Sixth Circuit noted in Smith is without a legitimate expectation of privacy in the vehicle. Similarly, the Court concludes that Reynaga did not have such an expectation of privacy in the GMC van.

Accordingly, since none of the Defendants had a legitimate or reasonable expectation of privacy in that vehicle, the Court concludes that none of the Defendants has standing to argue that the search of the GMC van violated the Fourth Amendment. That conclusion does not necessarily mean that the cocaine which was seized as a result of that search cannot be suppressed. Each of the four occupants of the GMC van has argued that his or her Fourth Amendment rights were violated as a result of his or her detention by Coverstone, when he converted the traffic stop into a drug investigation. If Coverstone violated any Defendant's Fourth Amendment rights as a result and if that the seizure of the cocaine was the fruit of that violation, the Court must suppress the cocaine as to that Defendant under the fruit of the poisonous tree doctrine. In addition, Simon argues that the cocaine seized from the GMC van must be

_____

[14]Although Reynaga told Coverstone that Demechor was her aunt, the Court is unable to credit the veracity of that statement, given that it was contradicted by a statement Servin made to that officer that Demechor was his aunt.

-9-

suppressed as to him under that doctrine.[15]  For reasons which follow, the Court

concludes that no Defendant, other than Reynaga, the driver of the GMC van, can seek

the suppression of the cocaine seized from that vehicle under the fruit of the poisonous

tree doctrine.  In particular, the Court explains below that Reynaga has standing to

challenge the constitutionality of <u>her own</u> detention and that the cocaine seized from the

blue GMC van was the fruit of <u>her</u> detention.  Therefore, it becomes necessary to

address the question of whether the detention of Reynaga violated the Fourth

Amendment.

     In <u>United States v. Carter</u>, 14 F.3d 1150 (6th Cir. 1994), the defendant, who had

been a mere passenger in a marijuana laden GMC van which was stopped and

searched by police officers, appealed his conviction for a marijuana related offense,

arguing, <u>inter alia</u>, that the District Court had erroneously overruled his motion seeking

suppression of the evidence seized from that vehicle.  The District Court had concluded

that the defendant was without standing to seek the suppression of that evidence, since

he did not have a legitimate expectation of privacy in the van, given that he had neither

an ownership nor possessory interest in it.[16]  Upon appeal, the defendant argued that

the evidence should have been suppressed under the fruit of the poisonous tree

doctrine, the evidence seized being fruit of his illegal detention.  The <u>Carter</u> court initially

concluded that a passenger in a vehicle has standing to challenge his detention,

writing:[17]

_____

[15]Since Simon was not an occupant of the GMC van when it was stopped,
Coverstone could not have violated that Defendant's Fourth Amendment rights by
detaining him.

[16]In contrast, the District Court had granted the driver's request to suppress the
evidence seized from the van, since he owned that vehicle.

[17]In <u>Carter</u>, the Sixth Circuit assumed for sake of argument that the defendant's
detention, if not illegal from its inception, had become illegal when the driver of the
vehicle was arrested.  14 F.3d at 1154.  Herein, in contrast, the Court concludes
below that the detention of Reynaga did not become unconstitutional at any time.

-10-

> "stopping an automobile and detaining its occupants constitutes a 'seizure' ... even though the purpose of the stop is limited and the resulting detention quite brief." <u>Delaware v. Prouse</u>, 440 U.S. 648, 653 (1979). A traffic stop "significantly curtails the 'freedom of action' of the driver and the passengers, if any, of the detained vehicle." <u>Berkemer v. McCarty</u>, 468 U.S. 420, 436 (1984) (emphasis supplied). And if a traffic stop was unlawful, as the Court of Appeals for the Tenth Circuit observed in <u>United States v. Erwin</u>, 875 F.2d 268, 272 (10th Cir. 1989)--a case where, as here, the defendant was a passenger in a vehicle driven by another--"the 'fruit of the poisonous tree' doctrine might dictate exclusion of the evidence discovered during the search."

<u>Id</u>. at 1154. <u>See also</u>, <u>Id</u>. ("A passenger, like anyone else, obviously has a right not to be detained illegally."). The Sixth Circuit concluded, however, that the discovery of the marijuana in the van was not fruit of the defendant's detention, since the defendant's detention "was not the proximate cause of the search of the van." <u>Id</u>. at 1155. Rather, that search flowed from the seizure of that vehicle's driver, since, as the Sixth Circuit noted, the marijuana was going to be discovered, even if the police had released the defendant, because it was located in a van owned and controlled by the driver (who was not going anywhere until his vehicle had been searched), and not in a vehicle controlled by the defendant. <u>Id</u>. at 1154. At the beginning of its opinion, the Sixth Circuit explained its rejection of the defendant's argument that the seizure of the evidence was fruit of the poisonous tree, the poisonous tree being his illegal detention:

> As to the fruit-of-the-tree argument, we have no doubt that the defendant had standing to challenge his own detention. His problem is that it was the arrest of the driver and the seizure of the driver's vehicle that led to the discovery of the marijuana, not any violation of the defendant's rights. Evidence obtained by exploiting a violation of the driver's constitutional rights could not be used against the driver, but we do not believe that the fruit-of-the-tree doctrine precluded the use of such evidence against the passenger.

<u>Id</u>. at 1151. The <u>Carter</u> court also explained:

> The very case on which Mr. Carter relies for his fruit-of-the-poisonous-tree argument, <u>Wong Sun v. United States</u>, 371 U.S. 471 (1963), shows that the argument is unavailing. Here is why.
> [Carter's co-defendant's] counterpart in <u>Wong Sun</u> was a man named Toy. Like [Carter's co-defendant], Toy was the victim of an illegal arrest. As in

-11-

[Carter's co-defendant's] case, the illegal arrest of Toy led directly to the discovery of drugs--and the Supreme Court held that the drugs were inadmissible against Toy. Mr. Wong Sun, the counterpart of Mr. Carter, had also been arrested illegally; neither Wong Sun's arrest nor the inadmissibility of the drugs in Toy's case made the drugs inadmissible against Wong Sun, however:

> "Our holding ... that this ounce of heroin was inadmissible against Toy does not compel a like result with respect to Wong Sun.
>
> \* \* \* \* \* \*
>
> The seizure of this heroin invaded no right of privacy of person or premises which would entitle Wong Sun to object to its use at his trial." 371 U.S. at 491-92.

Id. at 1154-55.

Similarly, herein, the Court concludes that it was the seizure of Reynaga and the vehicle which she had been driving, as well as her subsequent detention, which led to the discovery of the cocaine in the GMC van. Therefore, even if Servin, Camacho and Torres-Ramos were unconstitutionally detained by Coverstone, the cocaine seized from the van was not fruit of that poisonous tree, and, as a result, need not be suppressed.[18]

As to Simon, he contends that the search of the van and the seizure of the cocaine therein led to the subsequent search of the car in which he had been traveling on May 26, 2004. Simon does not contend that the seizure of the cocaine was the fruit of a constitutional deprivation he had suffered. Simply stated, the fruit of the poisonous tree doctrine does not authorize the suppression of evidence under those circumstances.

Given that Reynaga was the driver of the GMC van, the Court concludes that the discovery of the cocaine was the fruit of her detention. Coverstone stopped the vehicle that she had been driving and would not permit her to continue her journey. She is in an analogous situation with the driver of the vehicle in Carter. Therein, the District

---

[18]Below, the Court concludes that the detention of Reynaga did not violate the Fourth Amendment; therefore, it would decline to suppress the cocaine, even if it were fruit of the detention of the other occupants of the van, since detaining them likewise did not constitute a constitutional deprivation.

Court concluded that the discovery of the marijuana in that vehicle was fruit of the driver's unconstitutional detention.  In affirming the denial of the passenger's motion to suppress, the Sixth Circuit in Carter noted that the discovery of marijuana was fruit of the driver's, rather than the passenger's, illegal seizure.  Accordingly, the Court turns to the question of whether the detention of Reynaga violated her rights under the Fourth Amendment.

An ordinary traffic stop is analogous to a seizure under Terry v. Ohio, 392 U.S. 1 (1968).  See Berkemer v. McCarty, 468 U.S. 420, 438 (1984); United States v. Palomino, 100 F.3d 446, 449 (6th Cir. 1996).  Herein, Reynaga has not argued that the initial stop of her vehicle violated the Fourth Amendment; therefore, the Court focuses at this point on her detention after the initial stop.[19]  In Palomino, the Sixth Circuit indicated that, even if the initial stop was lawful, any subsequent detention must not be excessively intrusive.  Id.  Put differently, once the purpose of the traffic stop has been completed, a motorist cannot be further detained unless something that occurred during the stop generated a reasonable and articulable suspicion of illegal activity.  United States v. Mesa, 62 F.3d 159, 162 (6th Cir. 1993).  See also, United States v. Townsend, 305 F.3d 537 (6th Cir. 2003); United States v. Hill, 195 F.3d 258, 264 (6th Cir. 1999) ("Reasonable police conduct under such circumstances is such that any subsequent detention after the initial stop must not be excessively intrusive in that the officer's actions must be reasonably related in scope to circumstances justifying the initial interference. ...  Once the purpose of the traffic stop is completed, a motorist cannot be further detained unless something that occurred during the stop caused the officer to have a reasonable and articulable suspicion that criminal activity was afoot.") (citations omitted), cert. denied, 528 U.S. 1176 (2000).  In deciding whether reasonable suspicion

_____

[19]Such an argument would have been useless, since the Court credits Coverstone's testimony that the van was traveling 72 miles per hour where the maximum permissible speed was 65.

existed, this Court must not consider the factors relied upon by the officers to justify the detention in isolation, since to do so would be to ignore the totality of the circumstances. United States v. Arvizu, 534 U.S. 266 (2002). In determining whether the totality of the circumstances supports the conclusion that reasonable suspicion exists, the reviewing court must bear in mind that officers are entitled to draw on their own experience and specialized training to make inferences. Id. at 273. The Government has the burden of proving by the preponderance of the evidence the existence of a reasonable suspicion to believe, based upon objective and articulable facts, that the Defendants were engaged in criminal activity. See e.g., United States v. Rivas, 157 F.3d 364, 367 (5th Cir. 1998); United States v. Shareef, 100 F.3d 1491, 1500-01 (10th Cir. 1996); United States v. Winfrey, 915 F.2d 212, 216 (6th Cir. 1990), cert. denied, 498 U.S. 1039 (1991); United States v. Longmire, 761 F.2d 411, 417-8 (7th Cir. 1985).

According to Reynaga, Coverstone unconstitutionally transformed the initial traffic stop into a drug investigation approximately two minutes after the stop, when the Trooper requested that his dispatcher ask Gilman and Emir to come to the scene of the stop. This Court cannot agree. After stopping the GMC van, Coverstone met Reynaga between that vehicle and his cruiser. The latter gave him the registration for the van, which indicated that its owner lived in Vancouver, Washington, and her driver's license, which showed that she was a resident of Compton, California. At that point, Coverstone returned to his cruiser and asked his dispatcher to have Gilman and his drug detection dog come to the location of the stop. That communication did not, however, transform the traffic stop into a drug investigation. That communication lasted a matter of seconds, and Coverstone returned to the GMC van immediately after, in order to ask Servin questions about the owner of that vehicle and their trip. At that point, Coverstone had learned that the owner of the van was not in the vehicle and that she lived in Vancouver, Washington, while the two occupants for which he had been given identification were residents of the Los Angeles area. In addition, he had been told by

-14-

Reynaga that it was owned by her aunt; however, she could not remember her aunt's last name. Consequently, before completing the traffic stop, Coverstone quite properly attempted to ensure himself that the occupants of the van lawfully possessed it and questioned Servin to that end.

As a result of questioning Servin, Coverstone developed reasonable suspicion to believe that criminal activity was afoot. Reynaga described Servin as her boyfriend, while the latter described the former as his girlfriend. Notwithstanding that relationship, their explanations about how two residents of the Los Angeles area came to be in Ohio, driving a van owned by a resident of the State of Washington differed significantly. Reynaga indicated that the van was owned by her aunt, while Servin told Coverstone that it was owned by his aunt. Reynaga told the Trooper that they had gotten to Ohio by flying from Los Angeles to Vancouver, Washington, and then driving from that city. Servin, in contrast, indicated that his aunt had brought the van to the Los Angeles area and that they had driven from there. Indeed, the two could not even agree on their destination in the Dayton area. Servin said that they were going to visit his Aunt Ernestino, while Reynaga said they were on their way to see her friend. This is not an instance where occupants of a vehicle differ in the minute details of their travel plans. On the contrary, Reynaga and Servin differed on the fundamental aspects of their trip, who owned the vehicle in which they were traveling, how they had traveled to Ohio and their destination. Moreover, the suspicion raised by those divergent explanations was buttressed by the fact that Coverstone had smelled the strong odor of air freshener in the van. Based upon his training and experience, he noted that those transporting controlled substances in automobiles often use air freshener to mask the smell of those substances. In addition, when he returned to his cruiser after questioning Servin, Coverstone had contacted the DEA center in El Paso, during which he had learned that the residence of the owner of the van was under investigation and had been subjected to wiretaps. Accordingly, since the detention of Reynaga was supported by reasonable

-15-

suspicion, it did not violate her Fourth Amendment rights.  Therefore, the cocaine discovered in the GMC van need not be suppressed as to Reynaga, even though its discovery was the fruit of that detention.

Based upon the foregoing, the Court overrules the Motions to Suppress Evidence of Camacho (Doc. #38), Reynaga (Doc. #39), Servin (Doc. #41) and Torres-Ramos (Doc. #44).  In addition, the Court overrules the Motions to Suppress Evidence of Rhaburn (Doc. #38) and Simon (Doc. #40), as they relate to the evidence seized from the GMC van.

II.  Searches of the Vehicle in which Simon and Rhaburn Were Traveling on May 26, 2004 and of the Person of Paredes-Lima

After the discovery of nine kilograms of cocaine in the GMC van, Coverstone read Servin his Miranda warnings.  The latter agreed to cooperate with authorities in an attempt to make a controlled delivery of that cocaine.  Coverstone contacted the Dayton office of the DEA in order to secure assistance of DEA agents in the controlled delivery. As a consequence, Jorge Delrio ("Delrio"),[20] a police officer employed by the city of Dayton and assigned to a DEA Task Force, among others, met Servin at a Highway Patrol post.  Servin told the officers that on two previous occasions he had delivered cocaine to the Country Inn and Suites ("Country Inn"), that he would get a room at that motel and contact an individual known to him as "Cricket."  That individual had taken delivery of the previous shipments of cocaine.  Servin told the officer that "Cricket" had previously driven an early 1990's blue or gray Oldsmobile.

---

[20]The parties spell this officer's name both "Del Rio" and DelRio."  The Court has chosen to spell it "Delrio," because when asked during the suppression to spell his name, he said "D-E-L-R-I-O" (as reported by the Court Reporter) (see Transcript of October 8, 2004, Evidentiary Hearing (Doc. #67) at 5), without indicating that the "r" was capitalized or that there was a space between the third and fourth letters.

The officers then developed a plan to make a controlled delivery of the cocaine to "Cricket" at that motel.  Delrio and Servin rented a room at the Country Inn.  Timothy Braun ("Braun"), another police officer employed by the city of Dayton and assigned to that DEA Task Force, was also stationed at that location.  The blue GMC van in which Servin had traveled to Ohio was parked at that location, and Braun conducted surveillance from inside that van.

At the motel, Servin told Delrio that "Cricket" had called him on his cell phone just as the GMC van was being stopped by Coverstone, and had indicated that he would call Servin back later.  While Servin and Delrio were at the Country Inn, the former was called on his cell phone by an individual whom he identified as "Cricket."[21]  During that call, Servin told Cricket that he was in a room at the Country Inn.

Shortly thereafter, an Oldsmobile, matching that which Servin had provided of the vehicle driven by "Cricket," was driven into the parking lot of the Country Inn and parked next to the adjoining Arby's restaurant.  That automobile was occupied by two individuals, who were ultimately identified as Rhaburn and Simon.  They got out of the Oldsmobile and entered the Arby's.  Subsequently, an individual left the Country Inn and walked to the Arby's, where he briefly met with Rhaburn and Simon.  That individual was subsequently identified as Paredes-Lima.  He then left the Arby's and walked to the GMC van, which was parked in the lot by the Country Inn.  Paredes-Lima inspected the van closely, including looking in its windows and attempting to make contact with anyone who might be inside.  He then returned to the Arby's, where he briefly met with Rhaburn and Simon.  At that point, Paredes-Lima went back to the Country Inn.

After Paredes-Lima had for the second time left them at the Arby's, Rhaburn and Simon departed from that restaurant and got into the Oldsmobile.  They drove that

---

[21]"Cricket" had also called Servin earlier when the latter was at the Highway Patrol post.

vehicle to the area of the lot where the GMC van was parked and stopped to examine it.[22]  After they had driven away from the parking lot at the Country Inn, Rhaburn and Simon were stopped and arrested by officers,[23] at the direction of Russell Neville ("Neville"), Resident Agent in charge of the Dayton office of the DEA.  The Oldsmobile was searched, with cell phones being seized.  Thereafter, Paredes-Lima was arrested in a hallway of the Country Inn.  Papers and other items were seized from him.

Rhaburn and Simon argue that the Court must suppress the cell phones seized from the Oldsmobile in which they had been traveling on May 26, 2004, while Paredes-Lima seeks suppression of the papers and other items seized from him on that date. Whether to suppress any of that evidence depends upon whether officers possessed probable cause to believe that those three Defendants were involved in a conspiracy related to the nine kilograms of cocaine which had been seized from the GMC van on that date, and, thus, had probable cause to arrest them.[24]  It is axiomatic that police officers may conduct a warrantless search of an individual incident to a lawful arrest. Chimel v. California, 395 U.S. 752 (1969).  In New York v. Belton, 453 U.S. 454 (1981),

_____

[22]Rhaburn and Simon examined the van twice, once with the driver's side of the Oldsmobile facing the van, and the other with the passenger's side facing the van. As a consequence, each of those Defendants had the opportunity to get a good look at it.

[23]The Oldsmobile in which Rhaburn and Simon were traveling was stopped by Coverstone, who had remained actively involved in the attempted controlled delivery.

[24]The Government argues that neither Rhaburn nor Simon had a legitimate expectation of privacy in the Oldsmobile from which the cell phones were seized and that, therefore, they are without standing to seek the suppression of those items.  It bears emphasis, however, that whether a person has standing to seek the suppression of evidence allegedly seized in violation of the Fourth Amendment is a matter of substantive Fourth Amendment law, rather than a matter of jurisdiction under Article III of the United States Constitution.  Minnesota v. Carter, 523 U.S. 83 (1998).  Since the Court concludes below that the seizures of Rhaburn and Simon were supported by probable cause, it is not necessary to address the question of their standing.

-18-

the Supreme Court elaborated upon Chimel, holding that "when a policeman has made a

lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous

incident of that arrest, search the passenger compartment of the automobile."  Id. at

460.[25]  Accordingly, the Court turns to the question of whether probable cause to arrest

those three Defendants existed.  Not surprisingly, they deny that such probable cause

existed.  The Court begins its analysis by reviewing the standards it must apply in

resolving that question.

In Beck v. Ohio, 379 U.S. 89 (1964), the Supreme Court held that a

warrantless arrest of an individual in a public place does not violate the Fourth

Amendment if, at the time of the defendant's arrest, the police had probable cause to

believe that he has committed, is or will be committing an offense.[26]  In United States

v. Dotson, 49 F.3d 227 (6th Cir.), cert. denied, 516 U.S. 848 (1995), the Sixth Circuit

restated the test which must be applied to determine whether a warrantless arrest

was lawful:

> The Supreme Court has held that the test for whether an arrest is
> constitutionally valid is "whether, at the moment the arrest was made, the
> officers had probable cause to make it--whether at that moment the facts and
> circumstances within their knowledge and of which they had reasonably
> trustworthy information were sufficient to warrant a prudent man in believing
> that the petitioner had committed or was committing an offense."  Beck v.
> Ohio, 379 U.S. 89, 91 (1964); see United States v. Thomas, 11 F.3d 620, 627
> (6th Cir. 1993), cert. denied, 511 U.S. 1043 (1994).

Id. at 230.  In United States v. Strickland, 144 F.3d 412 (6th Cir.1998), the Sixth Circuit

explained that "there is no precise formula for determining the existence or nonexistence

of probable cause; rather, a reviewing court is to take into account the factual and

---

[25]The rule established in Belton applies equally whether a police officer arresting an
occupant of a vehicle first makes contact with the occupant while he or she is inside
or outside of the vehicle.  Thornton v. United States, 541 U.S. 615 (2004).

[26]Since Paredes-Lima was arrested in the hallway of the Country Inn, rather than
inside his room, the rule set forth in Beck concerning warrantless arrests is
applicable to his arrest.

practical considerations of everyday life that would lead a reasonable person to determine that there is a reasonable probability that illegality has occurred." Id. at 415. The Sixth Circuit has further explained that probable cause is "reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." United States v. Padro, 52 F.3d 120, 122-23 (6th Cir. 1995) (internal quotation marks and citation omitted). Moreover, "'probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity.'" United States v. Wright, 16 F.3d 1429, 1438 (6th Cir.) (quoting Illinois v. Gates, 462 U.S. 213, 244 n. 13 (1983)), cert denied, 512 U.S. 1243 (1994). Whether probable cause exists must be determined by examining the collective knowledge of the police. Thacker v. City of Columbus, 324 F.3d 244, 256 (6th Cir. 2003); Collins v. Nagle, 892 F.2d 489, 495 (6th Cir. 1989); United States v. Calandrella, 605 F.2d 236, 246 (6th Cir. 1979). Moreover, the determination of probable cause requires an examination of the objective reasonableness of the facts, with the officers' subjective intentions being irrelevant. Whren v. United States, 517 U.S. 806 (1996). Of course, the Government has the burden of proving that probable cause existed. United States v. Porter, 701 F.2d 1158 (6th Cir.), cert. denied, 464 U.S. 1007 (1983).

The following facts cause the Court to conclude that officers had probable cause to believe that Rhaburn, Simon and Paredes-Lima were jointly involved in an effort to receive the nine kilograms of cocaine Servin had transported across the country and, thus, involved in a conspiracy concerning the distribution of that controlled substance. Servin told them that he had previously delivered cocaine to "Cricket" at the Country Inn. After Delrio and Servin had gotten a room at that motel, "Cricket" called Servin, who told him that he was at that motel. Shortly thereafter, an automobile which matched the description of the car used by "Cricket," a description that Servin had given authorities, was seen being driven into the parking lot of that commercial establishment. The occupants of that car, Rhaburn and Simon, parked it and went into the adjacently located

-20-

Arby's.[27]  They were joined at that restaurant by Paredes-Lima, who had walked there from his room at the Country Inn.  Paredes-Lima left that establishment, walked to the van, examined it closely, and returned to the Arby's, where he met again with Rhaburn and Simon.  When those two drove away from that restaurant, they also examined the van.  While those facts may not be sufficient to prove beyond a reasonable doubt that these three Defendants were involved in a conspiracy relating to the distribution of the nine kilograms of cocaine seized from the van, they certainly constitute "reasonable grounds for belief" (Padro, 52 F.3d at 122).

Since officers had probable cause to arrest Rhaburn, Simon and Paredes-Lima, the searches of the Oldsmobile and the person of Paredes-Lima did not violate the Fourth Amendment.  Accordingly, the Court overrules the Motions to Suppress Evidence of Rhaburn (Doc. #38) and Simon (Doc. #40) as they relate to the evidence seized from that vehicle.  It also overrules the Motion to Suppress Evidence of Paredes-Lima (Doc. #35).

August 22, 2005                                    /s/ WALTER HERBERT RICE

                                    _____
                                    WALTER HERBERT RICE, JUDGE
                                    UNITED STATES DISTRICT COURT

Copies to:

Counsel of Record.

---

[27]That two individuals, rather than one, were in a car that matched the description of the one driven by "Cricket" does not detract from the existence of probable cause, since Servin had told officers that "Cricket" had, during previous deliveries, been accompanied by another individual.